Jerry **RANDLEMAN, et al.,** Plaintiff

v.

**FIDELITY NATIONAL TITLE
INSURANCE COMPANY,**
Defendant.

No. 3:06CV07049.

United States District Court,
N.D. Ohio,
Western Division.

Sept. 15, 2009.

David D. Yeagley, Marvin L. Karp, Shannan L. Katz, Ulmer & Berne, Mark R. Koberna, Mark E. Owens, Rick D. Sonkin, Sonkin & Koberna, Cleveland, OH, David B. Killalea, Mark A. Packman, Gilbert Randolph, Washington, DC, Ingrid L. Moll, Suzanne Lafleur Klok, William H. Narwold, Motley Rice, Hartford, CT, for Plaintiff.

Ernest E. Vargo, Lora M. Reece, Michael E. Mumford, Baker & Hostetler, James R. Wooley, Jones Day, Alexander E. Goetsch, Michael C. Cohan, Cavitch Familo & Durkin, Cleveland, OH, for Defendant.

## ORDER

JAMES G. CARR, Chief Judge.

This is a class action suit in which plaintiffs seek to recover money damages against Fidelity National Title Insurance Company (Fidelity), the provider of title insurance to institutions making loans to homeowners. Plaintiffs claim that the amount Fidelity charged class members violated a rate schedule filed with the Ohio Department of Insurance (Department).

In prior rulings, I overruled Fidelity's motion to dismiss, *Randleman v. Fidelity Nat. Title Ins. Co.*, 465 F.Supp.2d 812 (N.D.Ohio 2006), and certified a plaintiff class. *Randleman v. Fidelity Nat. Title Ins. Co.*, 251 F.R.D. 267 (N.D.Ohio 2008). Pending are Fidelity's motion for summary judgment or in the alternative to decertify the class [Doc. 91] and plaintiff's motion for partial summary judgment [Doc. 98]. For the reasons that follow, Fidelity's motion to decertify the class [Doc. 91] shall be granted. Pending a status/scheduling hearing, I make no ruling as to summary judgment.

### Background

Fidelity, along with all title insurers doing business in Ohio, is a member of the Ohio Title Insurance Rating Bureau (Bureau). Section 3953.28 of the Ohio Revised Code requires every insurer to file its rates with the Ohio Superintendent of Insurance. The

Bureau files a rate manual stating the rates title insurers will charge for policies.

The filed Rate Manual binds title insurers operating in Ohio. The filed rates include discounted rates set forth in Rules PR–9 and PR–10 of the Rate Schedule.

PR–10, captioned "Title Insurance Rate For Refinance Loans," states the discount at issue in this case:

When a refinance loan is made to the same borrower on the same land, the following rate will be charged for issuing a policy in connection with the new loan on so much of the amount of the new policy as represents the unpaid principal balance secured by the original loan; provided the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is requested, and the amount of the unpaid principal balance secured by the original loan. . . .

Ohio Title Insurance Rating Bureau, Schedule of Rates for Title Insurance in the State of Ohio (2003).

Plaintiffs refinanced their home mortgage in February, 2004. Their lender purchased a lender's title policy from NETCO Title Agency, a Fidelity agent. The cost of their title policy, as charged to plaintiffs at closing, was not discounted.

Because plaintiffs had purchased a title insurance policy within the ten-years before their 2004 refinancing, they believe they satisfied the preconditions of PR–10, qualified for a discounted reissue rate and should have paid less for their 2004 Fidelity policy. They allege that they were overcharged $ 213.57.

The cornerstone of plaintiffs' claims, and of class certification, is their contention that any homeowner who had a prior mortgage of record within ten years of a refinancing satisfies the requirements of PR–10. Plaintiffs contend that they, and other class members should have gotten, but did not get the benefit of the discounted rate provided by that Rule. This is so, plaintiffs assert, even if a refinancing homeowner, like themselves, did nothing affirmative to show that they had had a prior title policy within that period.

In *Randleman, supra,* 465 F.Supp.2d at 827, I overruled Fidelity's motion to dismiss as to plaintiffs' claims for breach of implied-in-fact contract and unjust enrichment.

I then granted plaintiffs' motion for class certification, defining the class as:

All persons who (i) paid for title insurance issued by defendant Fidelity National Title Insurance Company in connection with the refinancing of a residential mortgage loan on property located in Ohio that was completed on or after February 15, 2000, (ii) who were entitled to receive the "reissue" or "refinance" rate for title insurance pursuant to Section 8 or Section 9 of the Filed Rates (for transactions prior to February 1, 2002) or PR–9 or PR–10 of the Filed Rates (for transactions February 1, 2002 to the present), and (iii) paid more than the "reissue" or "refinance" rate for such title insurance.

*Randleman, supra,* 251 F.R.D. at 273.

In ordering class certification, I found that the class members were asserting a common legal theory: namely that they were "legally entitled to the discounted rate, but, as a direct result of Fidelity's acts and omissions, the Randlemans and all potential class members did not receive the discounted rate." I found that plaintiffs met the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure. *Id.*

A recent opinion, *Chesner v. Stewart Title Guaranty Co.,* 2009 WL 585823 (N.D.Ohio), by my colleague Judge Sara Lioi prompts Fidelity's request for summary judgment or alternatively class decertification. Fidelity contends that Judge Lioi correctly rejected two premises on which my certification order rested: 1) a prior institutional mortgage signifies issuance of a prior title insurance policy; and 2) Fidelity, by not notifying customers about the discount, waived the requirements of PR–10, at least to the extent that a refinancing homeowner had affirmatively to show the existence of a prior policy. *Id.* at *8–9.

In *Chesner,* Judge Lioi decertified a class after concluding that not all members of the class possessed a prior title insurance policy entitling them to the lower rate in PR–10;

therefore, no class-wide theory of liability existed. She also found that the waiver inquiry that I had projected to be too highly individualized to sustain class certification. *Id.* at \*9.

Fidelity argues its rates have the force and effect of law, and the discount in PR–10 contains mandatory preconditions for each class member. To be eligible for the discounted rate, each class member must have met the terms of PR–10: each must have had a prior title insurance policy and Fidelity must have received a copy of the prior policy or "other information sufficient to enable [Fidelity] to identify such prior policy upon which reissue is requested."

Despite Randlemans' claims and my original understanding to the contrary, Fidelity presents evidence to show that a prior institutional mortgage within the look-back period does not constitute "other information" sufficient to enable it to identify a prior policy on which reissue is requested. According to Fidelity, a prior bank or similar mortgage does not establish in every instance issuance of a prior title policy. That being so, Fidelity argues, no class can continue to be certified, because not all members of plaintiffs' class were entitled, or can prove they were entitled to the reduced rate. This is because not all of members of the class as currently defined possessed a prior policy.

■ Plaintiffs argue that I have already determined that Fidelity received sufficient "other information" under PR–10 when a title search disclosed an institutional mortgage within the look-back period. This determination, plaintiffs insist, is now the "law of the case." [1]

The Randlemans also argue that Fidelity waived its right to insist on preconditions because it routinely failed to tell homeowners purchasing title policies that they could obtain a discount if they produced a prior policy or "other information sufficient to enable the Insurer to identify such prior policy." They contend that Judge Lioi failed in *Chesner* to consider this waiver argument, and instead interpreted the waiver argument to mean that Fidelity waived its right to enforce the preconditions by not enforcing them against all refinancing parties.

### Standard of Review

■ Under Rule 23(c)(1)(C), an order under Rule 23(c)(1) granting class certification may be altered or amended before final judgment.

> After a class is certified, the court has a continuing duty to ensure that the requirements of Rule 23 remain satisfied as the case progresses.... Where ... no one set of operative facts establishes liability, no single proximate cause equally applies to each class member, and individual issues outnumber common issues, decertification of the class is required.

*Chesner, supra,* 2009 WL 585823, at \*11 (citations omitted).

■ Deciding class certification is a two-step process, with the party seeking certification having the burden of proof. *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). Plaintiffs "must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation." *Coleman v. General Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir.2002). Then they "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Id.*

Here, plaintiffs sought and I granted certification under Rule 23(b)(3), which requires that I find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

---

**1.** Under the "law of the case" doctrine, findings made at one point of the litigation become the law of the case for the subsequent stages of the litigation. *Rouse v. DaimlerChrysler Corp. UAW,* 300 F.3d 711, 715 (6th Cir.2002). My previous decision to certify was based on presumptions that Fidelity has since disproved with evidence that plaintiffs have failed to refute. Further, in my prior opinion granting certification, I expressly stated that preconditions for the PR–10 rate exist. The "law of the case" doctrine, therefore, does not preclude me from acknowledging those preconditions, and, in light of the evidence now of record, decertifying the class.

## Discussion

### 1. The Rate Manual Requires Possession of a Prior Title Insurance Policy

■ As Fidelity observes, I already held that PR–10 contains preconditions-including the issuance of a prior policy:

An applicant must satisfy preconditions in order to qualify for a refinance discount.... PR–10 ... provides that when a refinance loan is made to the same borrower on the same land, the insurer will charge a discounted premium for issuing a policy in connection with the new loan upon certain conditions, namely: 1) a current lender's policy is in force on the property ....

*Randleman, supra,* 251 F.R.D. at 278.

*Similarly,* Judge Lioi held in *Chesner:*

the language of the Rate Manual ... cannot be read to exclude the requirement of an actual policy ... The "other information" is inextricably tethered to the requirement that it enable the Insurer to identify the prior policy. Thus, whatever forms "other information" might take, it must lead eventually to an actual prior title policy.

*Chesner, supra,* 2009 WL 585823 at *13–14.

In seeking decertification, Fidelity argues that to be entitled to the PR–10 discount, each class member must show that he or she actually had a prior title insurance policy. Plaintiffs argue that to benefit from the discount, they do not need to show actual issuance of a prior policy as to each class member. They instead insist that under PR–10, they only need to provide "other information"—*i.e.,* some evidence of the existence of a prior policy.

That evidence, they contend, is the mere fact of a prior mortgage within the ten year look-back period. Because title insurers will learn of the prior mortgage within the look-back period, plaintiffs contend, they necessarily and always have "other information"

about prior issuance of a title insurance policy.

Plaintiffs claim that discovery proves that various insurers and agents read the language of the Rate Manual as eliminating any supposed requirement that a title policy purchaser present, beyond knowledge on the issuer's part of the fact of a prior mortgage, proof of an actual prior policy.

Plaintiffs find support for this contention in depositions in *Hickman v. First American Nat'l Title Ins. Co.,* Case No. 1:07cv01543 (N.D.Ohio 2007). Kevin Eichner, president of the Ohio bureau of First American National Title Insurance Company, the largest title insurance underwriter in Ohio, testified that the discounted rate may apply simply where there was a prior mortgage in the chain of title. Title agents, he stated, should be "as liberal as possible" in granting the discount—even where there is "doubt" as to the actual existence of a prior policy. (Doc. 112).

Plaintiffs add that the draftsman of the Bureau's filed rates, stated at his deposition that the language of PR–10 was "specifically intended to do away with any perceived need for a title insurance company to obtain a copy of the prior policy, and to codify the purported actual practice of being 'pretty liberal' in providing the discounted reissue rate." [Doc. 112].

At most, these statements show disparate application of PR–10. That some insurers or agents need nothing more than a prior mortgage to give the discount does not mean that all do.

As discussed in the next section, Fidelity's proof shows that a prior mortgage is not always equated with a prior title policy. Thus, practices and prerequisites are not uniform as to all class members. Uniformity—commonality—is, however, a precondition to class certification.[2]

### 2. A Prior Institutional Mortgage Does Not Equal a Prior Title Insurance Policy

The Randlemans assert that evidence of a prior institutional mortgage within the look-

---

**2.** Inconsistent application of the Rule does not mean that it is ambiguous. PR–10 is sufficiently clear. That some insurers and agents choose not to follow its mandate, and thereby favor customers with the discount even if they might not qualify for it adds to, rather than helps to resolve the problems with class certification in light of the present record.

back period, constitutes the giving of "other information sufficient to enable the Insurer to identify such prior policy," thereby entitling all members of the plaintiff class to the PR–10 discount. In my prior holding, I relied on this assertion to find that the plaintiff class shared common issues of fact in addition to a common legal theory.

A common issue of fact was that "[p]rior to a refinancing transaction each plaintiff had, within the ten-year look-back period, purchased either a prior lender's policy or a prior owner's policy with respect to the property at issue." *Randleman, supra,* 251 F.R.D. at 276. This finding was premised on my perception that a prior mortgage invariably, or nearly so invariably as to make any variation meaningless, meant that a prior policy had issued.

Fidelity argues, however, and has presented more evidence than previously to support that argument, that the fact of a prior mortgage does not necessarily mean that the refinancing homeowner in fact had a prior policy. Fidelity proffers several affidavits and deposition testimony from banks with branches throughout Ohio showing that lenders often rely on other forms of assurance of clear title, such as attorney opinion letters, title guarantees, and title searches, instead of prior title insurance policies. Fidelity also represents that it has copies of HUD–1 statements involving residential mortgage loans in Ohio from forty-five lenders (whom they list) that did not obtain a lender's policy in making those loans.

Fidelity has persuasively, if not conclusively shown that the variations in the forms of title assurance are not isolated to certain cities, counties, or even regions of the State. In some communities or areas, alternate forms of title assurance are much more common than others. What matters, though, is that the practice of having title assurance other than title insurance is both sufficiently commonplace and widespread that the presently defined class certification cannot be

maintained. There are simply too many homeowners throughout Ohio within the present definition for the current class to pass common fact, common legal theory muster. Those members of plaintiffs' class are not entitled to a discounted rate because they did not have a prior title insurance policy at the time of the earlier financing.

In *Chesner* Judge Lioi concluded that substantially similar evidence required her class decertification. The evidence persuaded her that the plaintiff class could not present class-wide proof establishing that each class member had a prior policy. This negated common issues of fact and common legal theory.

Judge Lioi concluded that whether each class member had a prior policy was a highly individualized inquiry, making class treatment improper:

> [T]here is no dispute that, as a matter of fact, not all prior mortgages were accompanied by a lender's policy. Even when construed most liberally in Plaintiff's favor, the language of the Rate Manual simply cannot be read to exclude the requirement of an actual prior policy and substitute in its stead (as Plaintiffs would have it) the mere existence of a prior mortgage.

*Id.* at *7.

In response, plaintiffs argue that the weight of the evidence in this case demonstrates that virtually all institutional mortgage loans are, and have been since well within the class period accompanied by title insurance. They assert that Fannie Mae, either a transfer point or end-station for nearly all mortgage transactions, requires lender's policies in all transactions in which it participates.[3] Plaintiffs also submit testimony by an expert that, as the mortgage lending industry evolved during his fifty years in the industry, a standard practice also evolved whereby lenders demand title insurance before providing financing.[4] Finally, plaintiffs call attention to a statement in Fidelity's own Form 10–K that "[i]n a real estate transac-

---

**3.** Fidelity has presented evidence disputing this contention about Fannie Mae's practices.

**4.** Fidelity's cross-examination of plaintiffs' expert raised doubts about the applicability and accura-

cy of his views *vis-a-vis* practices in Ohio, even with regard to mortgages destined for Fannie Mae.

tion financed with a mortgage, *virtually all real property mortgage lenders require their borrowers to obtain a title insurance policy at the time a mortgage loan is made.*" (Emphasis supplied).

Despite plaintiffs' evidence, the fact remains that, even if many, or even most class members had title insurance with their earlier financing, an indeterminate number (and, in all likelihood, not a small, much less legally insignificant number) did not. Whether that number is five percent, ten percent or fifty percent of the class as presently defined does not matter. The class is sufficiently large that, were it to prevail as presently configured, several thousand of its members would receive a refund to which they never were, and never could have been entitled.

■ In the face of Fidelity's evidence of disparate practices regarding title assurance, plaintiffs ask me to maintain the class and leave setting aside any unqualified members for the damages phase. They anticipate a claims process, perhaps involving a special master and bifurcated proceedings, to ensure that refunds go only to those members who in fact had a prior title policy.

Plaintiffs contend that Fidelity carries the burden of demonstrating which class members should be excluded. According to plaintiffs, it is an error of law to require that they prove that every class member had a prior lender's policy. Plaintiffs want me to proceed to find Fidelity generally liable for noncompliance with PR–10, and only thereafter sort out the sheep to be fed.

Plaintiffs cite *Beattie v. CenturyTel., Inc.,* 511 F.3d 554 (6th Cir.2007), and *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976), for the proposition that the liability and damages inquires are distinct, and the damages assessment properly follows a liability finding.

This is correct, but unresponsive to the problem plaintiffs face. That problem is that the evidence shows that class-wide liability cannot be based on the mere existence of a prior mortgage, which all homeowners refinancing within the look-back period would necessarily have. The result would be an initial ruling that Fidelity was liable to lots (perhaps lots and lots) of homeowners for whom no discount was or could have been available.

The decisions in *Beattie* and *Senter* do not open a door to avoiding this conundrum. In *Beattie* the court noted that all plaintiffs' "claims arise from the same allegedly deceptive billing practice." 511 F.3d at 561. In *Senter* the claims likewise arose out of allegations that defendant "engaged in a pattern and practice of discriminating against minority employees." 532 F.2d at 523.

Fidelity has shown that the basis on which I certified the class—the equivalence between a prior mortgage and a prior title policy—does not exist. As a result, the class, as presently defined, is, for liability purposes, over-inclusive. Unfortunately for plaintiffs, that circumstance is irrefutable, and its consequences cannot be postponed until the damages phase. Liability on a class-wide basis is to be determined before, and apart from determination of the individual amounts for which Fidelity is liable.

Plaintiffs cannot meet the requirements of Rule 23. They fail to show commonality, since they cannot raise questions of law and fact common to the class. They also cannot demonstrate typicality. *See, e.g., Beattie, supra,* 511 F.3d at 561 ("A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.").

■ Finally, plaintiffs cannot meet Rule 23(b)(3) predominance mandate, which asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." To satisfy this requirement:.

> a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof ... Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.

*Beattie, supra,* 511 F.3d at 564.

Plaintiffs cannot show commonality or typicality, or a common theory of liability. Is-

sues applicable to the class as a whole do not predominate over issues subject to individualized proof. Instead, individualized inquiries are required to determine liability.

### 3. Waiver Issues Require Individualized Inquiry

■ In *Randleman, supra,* 251 F.R.D. at 279, I noted in dicta that it was at least arguable that Fidelity

> [w]aived any right, as may have been provided to it under the Regulation, to confirmation that a prior policy had issued because Fidelity had not explained why it should be that a de facto uninformed borrower can be held to perform a condition precedent where the insurer, presumptively well informed about all applicable regulations, declines to inquire of the lender or borrower, or otherwise ascertain whether a prior policy was issued within the ten-year period.

Such waiver appeared to be another common question predominating among all class members. *Id.*

In response to this self-generated view, Fidelity presents evidence to demonstrate that: 1) disclosure of the requirements for obtaining a discounted rate did occur; and, 2) of even greater significance, issues of waiver are highly individualized, and far from common among class members.

Plaintiffs argue that Fidelity has had no uniform policy of disclosing, or requiring its agents to disclose the discounted rate. They state that their claim does not require proof that Fidelity failed to disclose the discount rate.

Fidelity responds that in my previous discussion of waiver, I found the controlling issue was disclosure or lack thereof. Fidelity argues that plaintiffs' contention that their waiver claim does not depend on non-disclosure is an attempt at undermining my emphasis on non-disclosure as fundamental to the waiver analysis.

**5.** Fidelity also argues that knowledge on the part of mortgage brokers must be imputed to borrowers as a matter of law. Without deciding whether that is so, I conclude that, even if it so, such imputation is not dispositive. What matters is

Non-disclosure to homeowners that they might qualify for a discount was the cornerstone of my waiver hypothesis. By failing to tell refinancing homeowners about the possible discount, I surmised, Fidelity indicated that it did not care whether the homeowner met the burden of showing the existence of a prior policy. Thus, Fidelity could not presently insist that class members show they could have met that burden.

To avoid the need to determine whether, despite lack of notice from Fidelity, individual class members were aware of the discount and its preconditions, Fidelity and its agents would have had to have withheld notice in every transaction. This did not occur: Fidelity has provided evidence that lenders and mortgage brokers knew of, some of its agents made some lenders aware of and mortgage brokers told borrowers about the discount.[5]

Plaintiffs respond that their claim for overcharging does not require proof of universal failure to disclose on Fidelity's part. Indeed, plaintiffs suggest, the very lack of uniformity highlights the egregiousness of Fidelity's conduct, because some of its customers received better treatment (learning about and benefitting from the discount) while others, left in ignorance, paid more than they would have, had they known about the discount.

My discussion of waiver was neither as thorough nor as on target as Judge Lioi's response to my dictum. Emphasizing the individualized character of waiver, she noted that "waiver is established only by proof that the waiving party intentionally acted in a manner inconsistent with claiming the right, *and those actions misled the other party to his prejudice,* thereby estopping the party having the right from insisting upon it." *Chesner, supra,* 2009 WL 585823, at *8 (emphasis supplied). Even if an intent on Fidelity's part to waive the preconditions of PR–10 could be presumed, which it cannot, each uninformed class member would have to show he was "mislead . . . to his prejudice."

that, there being no evidentiary basis for a class-wide finding of waiver by Fidelity, a waiver theory can neither overcome the defects now manifest in the present class definition nor justify continued certification.

Such intensely individualized inquiry is antithetical to class certification.

Plaintiffs have an additional waiver/estoppel theory: namely that, because Fidelity agents sometimes granted the PR–10 discount without proof, aside from a prior mortgage, of a prior policy, Fidelity is estopped from now demanding production by class members of such proof.

In response, Fidelity explains that its agents did not grant discounts without some reason to believe there had been a prior policy beyond simply a prior mortgage. According to Fidelity, its agents base discount eligibility on either HUD–1 forms, which provided absolute proof of a prior policy, direct and actual knowledge of particular lenders' practices, or title commitments obtained with the original mortgage.[6]

In any event, any waiver theory would require individualized inquiry into whether and how waiver may have occurred. I erred when I suggested that waiver might be another basis for class relief.

### 4. Potential for Discriminatory Application of Rate Manual

■■■ As noted, it appears likely that some of Fidelity's customers received the discount even though they were unaware of PR–10 and did nothing affirmatively to qualify for a discounted rate. It is fair to infer at this stage that some of those customers did not, in fact, qualify, but nonetheless got the discount. In light of this likelihood, plaintiffs claim that Fidelity's failure to grant the discount rates to all its customers simply on the basis of a prior mortgage in the look-back period constituted non-uniform, discriminatory and haphazard application of rates.

Fidelity responds, however, that its methods are not discriminatory and haphazard. It insists that no agent relied solely on a prior mortgage; rather, if an agent did not ask for the PR–10 information, he or she had some—typically localized—reason for believing that there was a prior policy.

Even if Fidelity's proof of its practices, and those of its agents is not conclusive, and some agents relied simply on the existence of a prior mortgage, that does not suffice to keep the class certified. This is so because, once again, ascertainment of which current class members have already benefitted from the discount on the basis merely of their refinancing within the ten year period would be highly individualized.

Plaintiffs' claim of disparate rates for similarly situated customers does not create common issues of law and fact or a common theory of liability sufficing to warrant continued class certification.

### Conclusion

Decertification of the class is warranted because: 1) a prior policy is required to qualify for the discounted rate, Fidelity has shown that all members of the class did not have a prior policy, making entitlement to the discounted rate, and liability on the part of Fidelity, an individualized inquiry; and 2) any waiver theory of liability also requires individualized inquiry.

### Conclusion

It is, therefore,

ORDERED THAT

1. The defendant's motion to decertify the class [Doc. 91] be, and the same hereby is granted; and

2. Further consideration of parties' counter-motions for summary judgment held in abeyance pending telephonic status/scheduling conference, which is scheduled for September 28, 2009 at 4:00 p.m.

So ordered.

---

6. A title commitment is the write-up of the title search performed by an agent in conjunction with the original mortgage. The title commitment indicates that an agent looked at the title, and on the basis of what the agent learned, agreed within the look-back period to issue a title insurance policy. [Doc. 128].